**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

UNITED STATES of AMERICA, et al. *ex rel.*
ARASH MOHAJER; CHRISTOPHER PETERSON

                       Plaintiffs and Relators,

    -against-

                                        No. 1:17-cv- 4176 (CM)

OMNICARE, INC.; CVS HEALTH CORP.,

                       Defendants
_____

### MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

This is a *qui tam* action brought under the False Claims Act by relators Arash Mohajer and Chris Peterson against Omnicare, Inc., a long-term pharmacy, and its successor-in-interest, CVS, which purchased Omnicare in August 2015. This case was originally filed on January 10, 2017 in the District of Utah; it was transferred to the Southern District of New York on June 5, 2017.

The allegations contained within Mohajer and Peterson's 2017 complaint are substantially similar to an earlier-filed *qui tam* complaint commenced by a different relator, Uri Bassan. Mr. Bassan's complaint – originally filed on June 1, 2015 in this district – is currently also pending before this Court. *See United States ex rel. Bassan v. Omnicare, Inc.*, No. 15-cv-4179 (CM) (S.D.N.Y.).

The United States, as is its right, has intervened in both actions, filing the same intervenor complaint in each case.

At bottom, all the complaints allege that, between 2010 and 2018, Omnicare consistently dispensed prescription drugs to individuals living at long-term residential facilities (i.e., assisted

living facilities and the like) that were not supported by valid prescriptions. Omnicare allegedly dispensed drugs based on prescriptions that had expired, run out of refills, or were otherwise invalid. Although the drugs were dispensed illegally (i.e., without a valid prescription), Omnicare nonetheless submitted claims for reimbursement to several federal healthcare programs (Medicare, Medicaid, and TRICARE). These submissions for reimbursement are alleged to have contained false information in violation of the FCA.

Although the allegations in this complaint are serious, Mohajer and Peterson's case runs into an obstacle. Their original complaint was filed while Bassan's *qui tam* action was pending. As a result, it is barred by the FCA's first-to-file rule, 31 U.S.C. § 3730(b)(5), and the relators' FCA claim is dismissed. The Court also declines to exercise supplemental jurisdiction over the 25 state and local law claims that relators added to an amended complaint in an effort to keep their case alive.

## I.   Background

### A.  Parties

The Plaintiff in every *qui tam* action is the United States of America, which filed an intervenor complaint in this case on December 17, 2019. The United States' complaint is identical to the one that it has filed in Mr. Bassan's action. *See United States ex rel. Bassan v. Omnicare, Inc.*, No. 15-cv-4179 (CM), ECF 17.

Relator Arash Mohajer is a pharmacist who previously worked as the Pharmacist-in-Charge at an Omnicare pharmacy in Salt Lake City, Utah. Relator Chris Peterson is a licensed pharmacy technician who worked at the same pharmacy. They will be referred to as the "Utah Relators."

Defendant Omnicare is a Delaware corporation that has its principal place of business in Ohio. Omnicare is the nation's largest provider of pharmacy services to long-term care facilities – facilities like nursing homes and assisted-living facilities. Omnicare employs around 13,000 employees and operates approximately 160 pharmacies across 47 states. It dispenses tens of millions of prescription drugs to residents of long-term care facilities each year. During the relevant period (2010–2018), Omnicare submitted over 35 million claims seeking payment for drugs dispensed to Medicare beneficiaries residing in assisted-living facilities, alone.

Defendant CVS Health Corporation owns thousands of retail pharmacies throughout the United States. CVS purchased Omnicare for approximately $12.7 billion in mid-2015 and began overseeing its operations shortly thereafter.

**B.  The Amended Complaint**

The original complaint in this action alleged two claims on behalf of the United States arising under the FCA. After the United States intervened in their case, the parties sent a letter setting a date for the Utah Relators to file an amended complaint, which, per that schedule, was filed on March 12, 2020.

The amended complaint alleges just one federal claim arising under the FCA, but it contained over one hundred pages of newly pleaded factual allegations against Omnicare and propounded several theories of FCA liability that were not mentioned in the Utah Relators' first complaint.

The amended complaint also added 25 claims on behalf of 24 states and the District of Columbia; those claims arise under state analogues to the FCA. Unlike the United States, the states and the District have all declined to intervene in this action.

### C. False Claims Act

1. Overview

The False Claims Act ("FCA") permits private citizens to file *qui tam* actions as "relators" to recover damages for fraud on behalf of the United States. Relators are entitled to recover a portion of the damages owed to the United States if their actions are successful. 31 U.S.C. § 3730(b).

Enacted in 1863, the FCA "was originally aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War." *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1996 (2016) (quoting *United States v. Bornstein*, 423 U.S. 303, 309 (1976)). And although the Act has since been amended several times, "its focus remains on those who present or directly induce the submission of false or fraudulent claims" to the government. *Ibid*.

"[W]hile the False Claims Act permits relators to control the False Claims Act litigation, the claim itself belongs to the United States," meaning that the federal government can intervene in any *qui tam* action filed on its behalf. *United States ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 508 (S.D.N.Y. 2014) (quoting *United States ex rel. Mergent Servs. v. Flaherty*, 540 F. 3d 89, 93 (2d Cir. 2008)). If the government declines to intervene and a relator ultimately succeeds in litigating the claim, the relator is entitled to between 25 to 30 percent of any recovery. 21 U.S.C. § 3730(d)(2). If the government chooses to intervene and takes over from the relator in prosecuting the case, the relator can still receive between 15 and 25 percent of any recovery. *Id*. at § 3730(d)(1).

2. Government Intervention

The FCA provides that, if the government decides to intervene in a *qui tam* action, then it "shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action." 31 U.S.C. § 3730(c)(1). Courts have interpreted this to mean that "by automatic operation of the statute, the Government's complaint in intervention becomes the operative complaint as to all claims in which the government has intervened." *Bilotta* 50 F. Supp. 3d at 511–12 (quoting *United States ex rel. Sansbury v. LB & B Associates, Inc.*, 58 F. Supp. 3d 37, 47 (D.D.C. 2014)). This is because the government is the true victim of the alleged fraud. Only the government has Article III standing to sue; the statute "effectively assigns the government's claims to *qui tam* plaintiffs." *United States ex rel. Kelly v. Boeing Co.*, 9 F. 3d 743, 748 (9th Cir. 1993). The relator – rather than suing because he or she has personally suffered – "invokes the standing of the government resulting from the fraud injury," and "stands in the shoes of the government, which is the real party in interest." *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1154 (2d Cir. 1993). But once the United States decides to intervene, it effectively "tak[es] over from the relator" in prosecuting the case. *United States ex rel. Wood v. Allergan, Inc.*, 899 F.3d 163, 166 (2d Cir. 2018).

Here, the government has intervened in Mohajer and Peterson's case for the purpose of prosecuting any FCA claim relating to the facts in suit. The relators do not dispute that the government's complaint is now the operative complaint as to those claims. As a result, the only operative claims in the relators' complaint are the claims brought on behalf of the 24 states and the District of Columbia, alleging violations of state FCA statutes.

**D. Pleadings**

As the government's complaint is the operative complaint for purposes of the federal FCA claims in both this action and in the earlier-filed *Bassan* action, this overview of the allegations against Omnicare and CVS come from the government's complaint.

1. Federal Law Permits Drug Reimbursements Only for Drugs Dispensed Pursuant to Valid Prescriptions, and all Information Submitted for Reimbursement Claims Must be Accurate

Federal law defines a prescription drug as one that "is not safe for use except under the supervision of a practitioner licensed by law to administer such drug." 21 U.S.C. § 353 (b)(1). Such drugs cannot be dispensed without a valid prescription, and federal law prohibits reimbursement for dispensations of prescription drugs not supported by a valid prescription. The statutes and regulations guiding the three federal programs relevant to this suit: Medicare, Medicaid, and TRICARE (together, the "Federal Healthcare Programs"), all prohibit reimbursement for prescription drugs dispensed without a valid prescription. *See, e.g.,* 42 C.F.R. §§ 423.104(h); 440. 120(a) (Medicare); 42 U.S.C. §§ 1395w-102(e); 1396d(a) (12) (Medicaid); 32 C.F.R. § 199.9(a)(4) (TRICARE).

The crux of any FCA action is the false claim. Generally, whenever a pharmacy dispenses a drug for a beneficiary of any of these Federal Healthcare Programs, it will file a claim with the Program (either directly or indirectly through a third-party) to obtain reimbursement for the portion of the drug not paid out-of-pocket by the beneficiary.

*Medicare*

Medicare beneficiaries receive prescription drug benefits through the Part D program, which is administered by private companies known as "Part D sponsors." Pharmacies like Omnicare submit "prescription drug event" data ("PDE") to Part D sponsors any time a prescription drug is dispensed. PDE data contains information such as the drug's name, its

prescriber, how the prescription was transmitted to the pharmacy, the number of times the prescription was filled, and the quantity dispensed. The Part D Sponsor then submits the pharmacy's PDE data to the Centers for Medicare and Medicaid Services ("CMS"), to obtain reimbursement for the pharmacy. Courts have long held that pharmacies' "PDEs, if they are alleged to contain false or inaccurate data, are false claims for purposes of the FCA." *United States v. TEVA Pharms. USA, Inc.*, No. 13-cv-3702 (CM), 2016 WL 750720, at \*25 (S.D.N.Y. Feb. 22, 2016); *cf United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 750 (3d Cir. 2017); 42 C.F.R. § 423.505(k)(3) (requiring "claims data generated by a related entity, contractor, or subcontractor of a Part D plan sponsor" to be accurate).

> *Medicaid*

Medicaid is a joint federal-state program that provides healthcare benefits for certain groups, primarily the poor and disabled. The federal government provides a portion of each state's Medicaid payments, but the programs are administered state-by-state. The federal Medicaid statute requires each participating state to implement plans containing specified minimum criteria for coverage and payment of claims. *See, e.g.,* 42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A). Like with Medicare, Medicaid coverage extends only to "prescribed drugs." 42 U.S.C. § 1396d(a)(12).

Whenever a Medicaid beneficiary submits a prescription claim to a pharmacy, the pharmacy dispenses the drug but also submits the claim to Medicaid. The claim – which can give rise to FCA liability – contains information like the date of the prescription, the number of refills authorized, how the prescription was transmitted to the pharmacy, the quantity of the drug prescribed, and the amount claimed for reimbursement. Medicaid providers like pharmacies must sign enrollment agreements with their state programs that certify their compliance with all state

and federal Medicaid requirements. These agreements typically require that the information the Medicaid provider submits for reimbursement is in compliance with all applicable state and federal laws and regulation. Requests for reimbursements submitted to Medicaid qualify as "claims" under the FCA. *See United States ex rel. Kester v. Novartis Pharms. Corp.*, 23 F. Supp. 3d 242, 260 (S.D.N.Y. 2014).

### *TRICARE (formerly CHAMPUS)*

TRICARE is part of the United States military's healthcare system and provides prescription drug benefits to members. Like Medicare, whenever a TRICARE beneficiary obtains a prescription through a pharmacy, the pharmacy submits an electronic claim to a Pharmacy Benefit Manager ("PBM") for that event. The record – called TRICARE Encounter Data ("TED") – contains information like the prescriber's identity, the date of the prescription, the number of authorized refills, etc. The TED is then submitted to TRICARE, which then authorizes the PBM to pay the pharmacy for the claim through government funds. All pharmacies that provide services to TRICARE beneficiaries are required to comply with its program requirements, including its anti-abuse provisions, which prohibit "misrepresentations of dates, frequency, duration, or description of services rendered, or of the identity of the recipient of the services or the individual who rendered the services." 32 C.F.R. § 199.9(c)(6).

### 2.   Long-Term Residential Facilities and Omnicare's Alleged Lack of Training

Omnicare pharmacies dispense and deliver prescription drugs to residents of long-term care facilities – facilities like nursing homes, assisted-living facilities, and skilled nursing facilities. These facilities can be tiered based on the level of care they provide to their residents. At the highest level are skilled nursing facilities ("SNFs"), which require medical care to be available for residents 24-7. SNFs have a doctor on staff at all times and function not unlike hospitals. Because

they provide around-the-clock care, some states permit pharmacies to dispense prescription drugs to residents based on a prescriber's "chart order" which is consistently reviewed and signed by the SNF's attending physician. These "chart orders" typically do not specify the total quantity of the drug prescribed or the number of refills authorized, because they are made with the understanding that there will be a physician available 24-7 to monitor a patient's intake of the drug. They are considered valid prescriptions in the SNF setting, meaning that pharmacies servicing SNFs are sometimes permitted to refill prescriptions without a set quantity or a set number of refills allowed.

However, the allegations against Omnicare do not concern its conduct at SNFs, but at "unskilled" residential facilities that do not offer around-the-clock medical care. These facilities include assisted-living facilities ("ALFs") and independent living facilities. Most importantly, in regard to drug prescriptions, individuals living in unskilled residential facilities are treated like individuals who reside at home – they must schedule visits with their own doctors to obtain prescriptions. For the most part, such prescriptions are limited, either by time or by quantity, and must be reupped if they expire. For example, state statutes provide that prescriptions expire after a certain period of time – typically one year. *See, e.g.*, N.Y. Comp. Codes R. & Regs. Tit. 18 § 505.3 (six months); Mich. Admin. Code R 338.479b (one year); 49 Pa. Code § 27.18 (one year); N.J. Admin. Code § 13:39-7.3 (one year); Ill. Admin. Code tit. 68 §§ 1330.500, 1330.520 (one year); Utah Code R 156-17b-612(9) (one year).

A major aspect of the government's allegation is that Omnicare treated prescriptions for patients living at unskilled facilities as though they were meant for patients at SNFs, and consistently refilled prescriptions without ever verifying or confirming whether the prescription had expired or was otherwise invalid. In the government's words, "Omnicare failed to put in place adequate systems, procedures, and training to ensure that its pharmacies fulfilled their core

obligations to (i) only dispense drugs that are supported by legally valid prescriptions; (ii) accurately track when those prescriptions expire; and (iii) obtain new prescriptions when necessary." (Gov't Compl., Dkt. No. 26 at ¶ 104).

According to the government, Omnicare pharmacists were under enormous pressure to process as many prescriptions as they could, often dispensing between 400 to 600 prescription orders *per day*. (*Id*. at ¶¶ 107–09). But Omnicare's pharmacies were understaffed to handle the workload, and managers exerted extreme pressure upon line-level pharmacists to process prescriptions as fast as possible.

Despite these pressures, Omnicare did not adequately train its pharmacists on how to handle their dispensing obligations. Although pharmacists had to navigate multiple regulations when dispensing drugs at unskilled residential facilities, Omnicare effectively left its employees to learn on the job, often without the training necessary on how to process the high volume of prescriptions they faced daily. Omnicare failed to train or guide pharmacy staff on how to track prescriptions at unskilled residential facilities to ensure that they were timely renewed once they expired or were exhausted. This precipitated the illegal conduct at issue: "rolling over" expired and exhausted prescriptions and continuing to dispense the drugs without a valid prescription.

### 3. Dispensations Without Valid Prescriptions

The government alleges that Omnicare dispensed drugs unsupported by valid prescriptions in three distinct ways: through its OmniDX dispensing system, through its "cycle fill" dispensing option, and through its Oasis dispensing system. Fundamentally for all three theories, Omnicare manipulated its systems by manipulating certain fields to allow dispensations to automatically occur even after a prescription had expired. Omnicare would then assign a new prescription

number to the expired orders and just continue dispensing – a process Omnicare called "rolling over" a prescription.

*OmniDX*

Whenever a new prescription arrives for an individual living at a long-term care facility serviced by Omnicare, an Omnicare entry technician is supposed to enter the prescription's information into one of two Omnicare dispensing systems: OmniDX or Oasis. Necessary information includes the drug's name and dosage, the prescription date, the prescriber's name, and any specific instructions associated with the prescription. The entry technician was also supposed to enter the total prescribed quantity – either in the total number of pills that could be dispensed (i.e., 200 pills) or the total number of refills allowed under the prescription (i.e., 5 refills).

Both the OmniDX and Oasis systems contained a setting that corresponded to whether prescriptions could be automatically refilled. In OmniDX, it was called "Retirement," which distinguished between whether the facility Omnicare was servicing was a "retirement" community like an ALF or if it was a more comprehensive healthcare facility like an SNF. If the facility was an unskilled residential facility that did not provide around-the-clock care, the entry technician was supposed to set the field to "Y" for yes. If the facility was a SNF, the field was supposed to be set to "N" for no.

The "Retirement" setting guided how other fields behaved – most critically, how refills were processed. When the field was set to "Y," the OmniDX system required pharmacy staff to manually enter a number in the "Refills Allowed" field, and the system would decline to process the prescription without a number entered into that field. Each time a prescription was refilled, the "Refills Allowed" field would decrease by one, and once the number hit zero, the system would alert Omnicare staff that a new prescription was required before any more drugs could be

dispensed. But if the "Retirement" field was set to "N" to indicate an SNF or otherwise high-level-care facility, the "Refills Allowed" field auto-populated to an artificially high number. This was based on the understanding that at SNFs, prescriptions could be continually dispensed because residents always had an on-staff physician to monitor them if necessary.

For example, for Medicare Part D patients, the auto-populated number when the field was set to "N" was 99, meaning that unless the number was manually overridden, Omnicare would automatically refill prescriptions up to 99 times without the system ever alerting staff that a new prescription was necessary. More critically, even after the automatically populated number of refills had run out (i.e., the 99 had gone all the way down to 0), Omnicare would sometimes allow the prescription to "roll over" by "automatically generating a new prescription number and resetting the default number of allowable refills." (*Id.* at ¶ 132).

The "Retirement" field also determined how OmniDX tracked a prescription's expiration date. The system typically tracked expiration dates through the "RX Issue Date" field, which was the date that the prescription was first filled. In accordance with state laws, once the statutory time for a valid prescription had passed, the system would alert pharmacy staff that a new prescription was required. But if the "Retirement" field was set to "N," after the prescription's expiration date, the system would automatically generate a "new order number (as if a new prescription had been obtained), and the RX Issue Date field automatically changed to the new fill date." (*Id.* at ¶ 134). This permitted the system to continue dispensing drugs long after the original prescription had expired.

*Cycle Fill*

Facilities serviced by the OmniDX system also had the option to "cycle fill" prescriptions. In contrast to "demand" dispensing, in which Omnicare refilled a prescription only after the facility

makes a specific request, facilities that utilized the "cycle fill" option received deliveries for multiple drugs based on a predetermined schedule. According to the government, prescriptions that were set to be "cycle filled" were automatically programmed in OmniDX to "roll over" – meaning that they were automatically refilled, regardless of whether the prescription had expired or not. (*Id.* at ¶ 163). Although Omnicare's written policies required staff to obtain confirmation from the facility that the residents whose prescriptions were being refilled were actually out of medication or otherwise needed it, this typically did not occur. Instead, the prescriptions were simply refilled on a regular cycle without review. For example, one email from an Omnicare of Chandler, Arizona employee stated that "The only request from the facility will be the initial new order for a particular medication and this will be sent to get the resident enough days to cycle fill. Then once the cycle is due, the med will be automatically refilled each month until someone from the facility [discontinues] the med." (*Id.* at ¶ 169). According to the government, Omnicare's failures to obtain the necessary authorizations/reviews to re-up cycle fill prescriptions were prevalent across the country.

### *Oasis*

Omnicare's Oasis system was similarly manipulated to automatically dispense invalid refills. Like the "Retirement" field in OmniDX, Oasis had a field called "Prescribed Quantity Required," which corresponded to whether the serviced facility required a specific total quantity of medications prescribed (i.e., unskilled residential facilities) or whether a specific quantity was not required because it had around-the-clock care (i.e., SNFs). In Oasis, if the "Prescribed Quantity Required" was set to "Y," Omnicare staff needed to enter the total quantity of drugs prescribed or the authorized refills per order for the system to process the prescription. And like OmniDX, once the number of refills allowed were exhausted, Oasis prevented additional dispensations without a

new prescription. But if the field were set to "N," then Oasis did not require Omnicare staff to enter any specific quantity allowed or refills permitted. Instead, Oasis would "assign a new order number as if a new prescription had been received" whenever the prescription needed to be refilled, "and Omnicare pharmacy staff would dispense the drug indefinitely without receiving notice that they needed to contact the patient's treating physician to obtain a new prescription." (*Id*. at ¶ 138).

*Summary*

The allegations brought by the United States against Omnicare can be summarized as follows: (1) the OmniDX theory – focused on the "Retirement" setting in the system and how it was often improperly set to "N" to allow for continual refills; (2) the cycle fill theory – focused on how OmniDX's cycle-fill orders would routinely refill prescriptions that had expired; and (3) the Oasis theory – focused on how the "Prescribed Quantity Required" setting in the Oasis system was often improperly set to "N" to allow for continual refills.

All of these actions resulted in "Omnicare pharmacies throughout the country routinely dispens[ing] prescription drugs to Federal Healthcare Program beneficiaries residing in [assisted-living facilities] and other Residential Facilities based on stale, invalid prescriptions." Omnicare then "billed Government Payors for these illegal drug dispensations," submitting false claims in the process. (*Id*. at ¶ 142).

**E. Bassan's Qui Tam Case**

Mohajer and Peterson – the relators of this instant case – were not the first relators to file a complaint against Omnicare. Another relator, Uri Bassan, filed a *qui tam* complaint under seal in the Southern District of New York on June 1, 2015. *See United States ex rel. Bassan v. Omnicare, Inc.*, No. 15-cv-4179 (CM) (S.D.N.Y.). Bassan had previously worked as the Pharmacist-in-Charge at an Omnicare pharmacy in Albuquerque, New Mexico. Bassan's

complaint alleged a total of 32 claims, two under the federal FCA, and 30 under the state FCA laws of 29 states and the District of Columbia. All of the state-law claims in the Utah Relators' amended complaint are included in Bassan's original complaint, as are claims based on False Claims statutes in Georgia, Maryland, Texas, Vermont and Wisconsin.[1]

Bassan's allegations detail Omnicare's heavy reliance on its OmniDX and Oasis systems, and how data-entry staff were required to enter prescription information into the systems – most critically the quantity of the drug prescribed. According to the complaint in *Bassan*, if the prescription was set to cycle fill, Omnicare's software would "automatically" authorize another supply of the drug, "*again and again*, regardless of whether a new prescription is ever obtained from the patient's physician or any other medical practitioner who is authorized to write prescriptions." (Bassan Compl. at ¶ 51). Bassan's complaint also details how Omnicare failed to distinguish between ALFs and SNFs, and instead treated the two types of facility similarly, such that prescriptions that were supposed to be limited were continually refilled at ALFs as if they had actually been written for residents at SNFs. (*Id*. at ¶ 66). Omnicare then submitted claims for reimbursement to Medicare and Medicaid based off of these improper dispensations.

Although Mohajer and Peterson's complaint contains factual details that are not pleaded in Bassan's complaint – for example details about the specific fields in the Omnicare systems and about the intake process at Omnicare more generally – the overarching allegations of fraud in this case are identical to Bassan's. Mohajer and Peterson alleged that Omnicare placed great reliance on its computer systems, and that data-entry staff were tasked with accurately entering prescription information into them. (*See* Dkt. No. 24 at ¶ 95). They also alleged that Omnicare abused its cycle fill program to consistently refill orders without valid prescriptions, and that Omnicare would

---

[1] It appears from the text of the Utah Relators' amended complaint that they intended to bring claims on behalf of all these states other than Georgia, but no such claims are actually pleaded as separate counts.

submit false claims for reimbursement to Medicare for drugs dispense without prescription, which is illegal. (*Id.* at ¶¶ 107, 166).

After several years of investigation, the United States intervened in both lawsuits. It filed the same exact intervenor complaint in both Bassan's case and this case on December 17, 2019. The Government's complaint alleges five claims: three claims arising under the FCA, one claim of "payment by mistake of fact" and one claim of "unjust enrichment." Obviously, the Government's complaints do not include any allegations under the laws of the several states or the District of Columbia.

### F. Pending Motions

Presently before the Court in this case are three motions to dismiss: (1) Omnicare's motion to dismiss the government's intervenor complaint (which is identical to the motion to dismiss it filed in Bassan's case); CVS's motion to dismiss (also identically filed in the Bassan case) for two reasons additional to the ones stated in Omnicare's motion – that the government and the relators have failed to allege veil-piercing or CVS's direct participation in the Omnicare scheme; and (3) Omnicare's motion to dismiss Mohajer and Peterson's amended complaint.

This opinion deals only with the last of these motions.

## II.  Discussion

Because the United States has intervened, the court should consider whether the relators' complaints – which necessarily contain allegations and claims that are duplicative of the Government's – can be dismissed. Omnicare suggests several reasons why relators' amended complaint should be dismissed; these include the FCA's public-disclosure bar, the government's intervention into the action, and the first-to-file bar.

Although much ink has been spilled on the questions of whether the public-disclosure bar and the first-to-file bar deprive a district court of subject matter jurisdiction over a relator's claims,

the Second Circuit has concluded that neither does. *See United States ex rel. Chorches for Bankruptcy Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 80 (2d Cir. 2017) ("[W]e join the majority of our sister circuits that have addressed the issue in holding that the public disclosure bar is no longer jurisdictional."); *United States ex rel. Hayes v. Allstate Ins. Co.*, 853 F.3d 80, 85 (2d Cir. 2017) ("[W]e join the D.C. Circuit in holding that the first-to-file rule is not jurisdictional and instead bears on the merits of whether a plaintiff has stated a claim."). But regardless of whether these doctrines are jurisdictional or merely raise some procedural bar, if either justifies dismissal of the Utah Relators' complaint, then in the interest of judicial economy the Court should do so on that basis.

### A. Count One of Mohajer and Peterson's Amended Complaint is Dismissed Without Prejudice Pursuant to the FCA's First-Filed Bar

Count one of relators' amended complaint is relators' only federal claim. It alleges that the defendants' conduct violated 31 U.S.C. §§ 3729 (a)(1)(A), (B), and (G).

The FCA provides that that "When a person brings an action under [the FCA], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). Courts have interpreted the command to be "simple: as long as a first-filed complaint remains pending, no related complaint may be filed." *Wood*, 899 F.3d at 167 (quoting *United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1210 (D.C. Cir. 2011)). "The first-to-file bar ensures that only one relator shares in the Government's recovery and encourages potential relators to file their claims promptly," *ibid*, and limits "the danger of parasitic exploitation of the public coffers." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994); *see also United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 927 (D.C. Cir. 2017). "Allowing a follow-on filer to siphon off the first-filed suit's proceeds 'weaken[s] the incentive to dig out the facts and launch the initial action.'" *United States v.*

17

*Millennium Labs, Inc.*, 923 F.3d 240, 252 (1st Cir. 2019) (quoting *United States ex rel. Chovanec v. Apria Healthcare Grp. Inc.*, 606 F.3d 361, 364 (7th Cir. 2010)). In short, the doctrine incentivizes potential relators to do their homework, to investigate the claims accordingly, and to bring as robust a complaint as possible. Tag-along relators cannot share in the recovery and courts need not spend time deciding the merits of their claims.

The focus is on whether the later-filed action is "related" to the first. *See* 31 U.S.C. § 3730(b)(5). Only the original complaint filed in each action is considered, as the FCA states that "no person . . . may *bring* a related action based on the facts underlying the pending action." *Ibid* (emphasis added). "To 'bring an action' is to 'institute legal proceedings,'" *Wood*, 899 F.3d at 171 (quoting *Black's Law Dictionary* 231 (10th ed. 2014)), which means that the first-file bar prohibits a second or third or fourth relator from commencing a related proceeding once there is a pending proceeding that alleges substantially the same facts.

Amending or supplementing a later-filed complaint cannot save it from the first-to-file bar, because it "does not *bring* a new action, it only *brings* a new complaint into an action that is already pending." *Wood*, 899 F.3d at 172. The FCA's "statutory command is not ambiguous: a claim is barred by the first-to-file bar if at the time the lawsuit was *brought* a related action was pending." *Ibid*.

Thus, for purposes of deciding whether Mohajer and Peterson's case should be dismissed pursuant to the first-to-file bar, the Court looks only at the original complaint they filed in 2017 – and not the amended complaint they filed in March 2020 in a desperate effort to save their status as relators. The result, however, is the same even if the Court looks at the 2020 amended complaint.

The Second Circuit has held that "A second action is 'related,' within the meaning of [Section 3730(b)(5),] if the claims incorporate 'the same material elements of fraud' as the earlier

action, even if the allegations incorporate additional or somewhat different facts or information." *Id.* at 169 (quoting *United States ex rel. Heath v. AT & T Inc.*, 791 F.3d 112, 121 (D.C. Cir. 2015)). The focus is on the "essential facts" alleged. If the first-filed complaint permits the government to investigate fully the fraud that is alleged – i.e., if the first-filed complaint puts the government on notice of the underlying fraudulent scheme – then the two cases are "related," regardless of whether the specific means through which the fraud was perpetrated differ from relator to relator.  The focus is on whether the "first-filed complaint ensures that the Government 'would be equipped to investigate' the fraud alleged in the later-filed complaint." *Ibid.* (quoting *Heath*, 791 F.3d at 121). Even if a later-filed complaint "incorporates somewhat different details," the first-to-file bar still applies as long as "the government knows the essential facts of a fraudulent scheme, [and] it has enough information to discover related frauds."  *United States ex rel. Wilson v. Bristol-Myers Squibb, Inc.*, 750 F. 3d 111, 118 (1st Cir. 2014).

Here, Mohajer and Peterson's complaint contains the same "essential facts" as Bassan's complaint. Both complaints allege that Omnicare obtained reimbursement for dispensations of prescription drugs unsupported by valid prescriptions (*see* Bassan Compl. at ¶ 3 with Mohajer Original Compl. ("OC") at ¶ 3), and both allege that Omnicare's computer systems played an integral part in perpetrating the scheme. Both complaints focus on Omnicare's actions regarding refills, and how the company manipulated the fields regarding the number of refills allowed in its computer systems to enable it to continue dispensing prescriptions even after they had expired. (*see* Bassan Compl. at ¶¶ 46–69; Mohajer OC at ¶¶ 101–15). Each complaint details how Omnicare staff was required to manually enter data into the system whenever the pharmacy receives a new prescription, but that – when the incorrect data is entered – the system allows for continual dispensations. (*See* Bassan Compl. at ¶¶ 46–50; Mohajer OC at ¶¶ 95–98). Both complaints

19

mention Omnicare's OmniDX and Oasis systems, and also detail how the "cycle fill" option was used to automatically fill expired prescriptions. (Bassan Compl. at ¶¶ 106–20; Mohajer OC at ¶¶ 102–06). They each also explain the process of how Omnicare submitted false claims to federal healthcare programs like Medicare and Medicaid based on these invalid dispensations. (Bassan Compl. at ¶¶ 70–105; Mohajer OC at ¶¶ 166–72).

Mohajer and Peterson argue that their complaint includes details not contained within Bassan's complaint: among them, that Omnicare allegedly dispensed illegal refills through processes other than cycle fill, and that Omnicare staff sometimes knowingly entered blatantly wrong information into their system to allow for improper dispensations. According to them, Bassan's complaint focuses solely on how Omnicare's cycle fill option helped perpetrate the scheme, but ignores the finer details of the fraud, including the extent of it beyond cycle fill.

But the inclusion of additional or more specific details in a later-filed *qui tam* complaint does not alter the analysis of whether the later-filed complaint "relates" to the first. Relatedness is not a difficult threshold to meet. It focuses on "whether the later complaint alleges a *fraudulent scheme* the government already would be equipped to investigate based on the first complaint." *Heath*, 791 F.3d at 121 (quoting *Batiste*, 659 F.3d at 1209) (emphasis added). The focus is on the fraud itself, not the specific details about how the scheme may have been carried out at different locations or different times. If a scheme had a defined fraudulent object and was orchestrated through *substantially* similar means, involving *substantially* the same actions, then complaints uncovering the scheme are related.

Here, both complaints allege the same fraudulent scheme – that Omnicare filed false claims to the government by manipulating its internal systems in such a way so as to allow the consistent and unchecked dispensation of drugs without valid prescriptions.

This is not an instance in which Mohajer's complaint alleges claims against a fundamentally different defendant, *see United States v. McKesson Corp.*, 2019 WL 438357, at * 9 (E.D.N.Y. Feb. 4, 2019), or one where two separate schemes, carried out via wholly-different mechanisms, were alleged, *see Millennium Labs.*, 923 F.3d at 252. Bassan's earlier-filed complaint was sufficient to alert the Government to the ongoing scheme at Omnicare, and "equipped" it to investigate the scheme in full, without regard to anything contained in the Utah Relators' later-filed complaint. *See Wood*, 899 F.3d at 169. The very fact that the government filed identical intervenor complaints in both cases evidences their relatedness.[2]

Finally, I note that Mohajer and Peterson could not save their FCA claim from the first-to-file bar simply by amending their complaint. The Second Circuit has clearly held that "amending or supplementing a complaint does not *bring* a new action, it only *brings* a new complaint into an action that is already pending." *Id*. at 172. Accordingly, "a first-to-file violation cannot be cured by amending or supplementing a complaint." *Id*. at 175.

I thus conclude that, when Mohajer and Peterson filed their complaint filed in 2017, it was "related" to Bassan's complaint, which had been filed in 2015 and was pending. For that reason, Mohajer and Peterson are statutorily precluded from pursuing their FCA action, and the federal claim that originally gave this court jurisdiction over the Utah Relators' lawsuit must be dismissed.

### B.  The Remaining State-Law Claims Are Dismissed Without Prejudice

No doubt having realized that their status as federal relators was doomed from the moment their case was filed, the Utah Relators included in their amended complaint 25 counts arising under

---

[2] Ironically, Bassan's earlier-filed complaint arguably contains more detail than the later-filed complaint. It alleges that Omnicare perpetrated the scheme by failing to distinguish between SNFs and unskilled residential facilities, such that prescriptions intended for unskilled facilities – which were meant to be limited in nature – were treated as if they were unlimited. This allegation is central to the government's intervenor complaint, but it appears nowhere in Mohajer and Peterson's original complaint.

the laws analogous to the federal FCA of 24 states and the District of Columbia. The factual allegations underlying these claims are substantially similar to the factual allegations underlying the federal claims that have now been dismissed under the first-filed rule; however, they are brought on behalf of the state-level entities, not the federal government. The question that remains is: what is the status of these state-law claims now that the Utah Relators' federal FCA claim has been dismissed?

The answer is: there is neither federal question nor diversity jurisdiction over these claims. The only basis under which this Court could take cognizance of them is supplemental jurisdiction, and I decline to exercise supplemental jurisdiction for the sole purpose of keeping the Utah Relators in this case.

31 U.S.C. § 3732(b) provides that "The district courts shall have jurisdiction over any action brought under the laws of any State for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under section 3730." This provision confers federal district courts with jurisdiction over state-law FCA claims. However, that jurisdiction is only *supplemental jurisdiction*. This section of the FCA does not create any independent cause of action arising under federal law; it only extends federal jurisdiction to claims "brought under the laws of any State." It does not confer federal question jurisdiction under 28 U.S.C. § 1331.

Many courts have so interpreted this provision. Our own Second Circuit Court of Appeals has noted that the provision only "permits the *joinder*, in an FCA suit, of related state-law claims where those claims are 'for the recovery of funds paid by a State.'" *United States ex rel. Stevens v. State of Vt. Agency of Natural Res.*, 162 F.3d 195, 205 (2d Cir. 1998) (quoting 31 U.S.C. § 3732(b)), *overruled on other grounds by Vt. Agency of Natural Res. v. United States ex rel. Stevens*,

529 U.S. 765 (2000) (emphasis added). Similarly, the D.C. Circuit has opined that the "obvious reading of § 3732(b)" is that "it authorizes permissive intervention by states for recovery of state funds" or "to provide supplemental jurisdiction for a non-state relator to join a federal false claim action with an action to recover state funds under a *state qui tam* statute." *United States ex rel. Long v. SCS Bus. & Tech. Inst., Inc.*, 173 F.3d 870, 880 (D.C. Cir. 1999); *cf United States ex rel. Woodward v. Country View Care Ctr., Inc.*, 797 F.2d 888, 893 (10th Cir. 1986) (describing state-law claims included in a federal FCA action as "pendent").

In short, § 3732(b) only confers supplemental, or pendent, jurisdiction over claims brought on behalf of states that arise under state law as long as those claims are inextricably linked to a pending federal claim. Those state claims do not "arise under" the laws of the United States.

There is, of course, another basis for original jurisdiction in federal court: complete diversity between plaintiff and defendant and an amount in controversy over $75,000. *See* 28 U.S.C. § 1332. But diversity exists only between "citizens" of the several states. States – who are the real parties in interest in a state-law *qui tam* action – are not "citizens" of themselves. Since 1894, it has been clear that, "A state is not a citizen. And under the [laws] of the United States it is well settled that a suit between a state and a citizen or a corporation of another state is not between citizens of different states." *Postal Telegraph Cable Co. v. Alabama*, 155 U.S. 482, 487 (1894); *see also Stone v. South Carolina*, 117 U.S. 430, 433 (1886); *Moor v. Alameda Cnty.*, 411 U.S. 693, 717 (1973) (there is "no question that a State is not a 'citizen' for purposes of [ ] diversity jurisdiction.") As a result, the fact that a state *qui tam* complaint is brought on behalf of, say, the State of Georgia, of which neither Omnicare nor CVS is a citizen, does not confer diversity jurisdiction upon a federal court.

For diversity purposes, the Utah Relators' citizenship is irrelevant, since they are not the real parties in interest. *Missouri, K. & T. Ry. Co. of Kansas v. Hickman*, 183 U.S. 53, 59 (1901); *cf Indiana ex rel. Harmeyer v. Kroger Co.*, No. 1:17-cv-538 (JMS) (DML), 2017 WL 2544111, at *1 (S.D. Ind. June 13, 2017). As recently as 2014, the Supreme Court held that, in actions ostensibly filed on behalf of a state, courts must inquire "into the real party in interest because a State's presence as a party will destroy complete diversity." *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 174 (2014).

As far as this Court is aware, every court that has confronted whether a claim arising under an analogous state FCA statute can be removed to federal court under § 3732(b) has concluded that it cannot. *See, e.g., In Re Pharm. Indus. Average Wholesale Price*, 509 F. Supp. 2d 82, 93 (D. Mass. 2007); *Hawaii v. Abbott Labs., Inc.*, 469 F. Supp. 2d 835, 841 (D. Haw. 2006). Since only claims over which a federal court would have had original jurisdiction can be removed, it is necessarily the case that a federal district court has only supplemental jurisdiction over state-law *qui tam* claims.

As a result, "In a *qui tam* suit involving both state and federal claims, once the federal claims are dismissed, the court no longer has original jurisdiction pursuant to section 3730(b)," and a "Court may then decline to exercise supplemental jurisdiction" over the state-law claims that were related to the federal claim. *United States ex rel. LaFauci v. AbbVie Inc.*, No. 2:15-cv-7031, 2019 WL 1450791, at *5 (D.N.J. Apr. 2, 2019); *see also United States ex rel. Wood v. Allergan*, 2020 WL 3073292, at *6 (S.D.N.Y. June 10, 2020). I decline to do so here.

There is a perfectly good reason why it would be appropriate to decline to exercise supplemental jurisdiction over the State claims in this case – they are already pending in the *Bassan* case. There is absolutely no need to have two sets of Relators prosecuting those claims. Moreover,

while our research has not been exhaustive, I note that at least some states have their own first-filed rules, which would dictate dismissal of the Utah Relators' state-law claims which were not filed until after Bassan filed his state-law claims. Thus, the Utah Relators' claims are likely also precluded under these states' first-to-file bars. *See, e.g.*, N.Y. State Fin. Law § 190.4 (same language as federal FCA regarding "bringing" an action when a "related" action is "pending"); NC Gen. Stat. §1-608 (same); OK Stat. § 63-5053.2; R.I. Gen. Laws §9-1.1-4 (same).

### Conclusion

The amended complaint is to be dismissed in its entirety. Dismissal of all claims is without prejudice to the interest of the United States in the prosecution of the dismissed federal claim or to the interest of any State or the District of Columbia.

The Clerk of the Court is respectfully directed to remove the motions at Dkt. Nos. 68, 70, and 72 from the Court's list of pending motions, and to close this case.

Dated: March 12, 2021

_____

Chief Judge

BY ECF TO ALL COUNSEL